IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

STEVEN LYNN ABSHIER                )
                                    )
          Petitioner,               )
                                    )
vs.                                 )          Case No. CIV-02-1138-D
                                    )
RANDALL G. WORKMAN, Warden,         )
     Oklahoma State Penitentiary,   )
                                    )
          Respondent.               )


## MEMORANDUM OPINION

Petitioner, a state prisoner currently facing execution of a sentence of death, appears

with counsel and petitions for a Writ of Habeas Corpus pursuant to 28 U.S.C.A. § 2254,

challenging his conviction in the District Court of Oklahoma County, Case No. CF-95-2194.

Respondent has responded to Petitioner's *Petition for a Writ of Habeas Corpus* (hereinafter

"Petition".)[1]  Petitioner has replied to this Response.  The state court record has been

supplied.[2]


## I. PROCEDURAL HISTORY

---

[1] References to the parties' pleadings shall be as follows: Petitioner's *Petition for a Writ of Habeas Corpus* shall be cited as (Pet. at __.); Respondent's *Response to Petition for Writ of Habeas Corpus* shall be cited as (Resp. at __.); Petitioner's *Reply* shall be cited as (Reply at __.);

[2] The trial court's original record shall be cited as (O.R. at __.).  The trial transcript shall be cited as (Tr., Vol. ___, p. __.).

Petitioner was convicted by jury in the District Court of Oklahoma County, State of Oklahoma, Case No. CF-95-2194, for the crime of First Degree Murder of a Child for the death of Ashley Abshier. The jury recommended the imposition of a death sentence, finding the existence of two aggravating circumstances: the murder was especially heinous, atrocious, or cruel; and, the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

Petitioner appealed his convictions and his death sentence to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). Petitioner also filed an application for evidentiary hearing. The OCCA granted Petitioner's application and remanded the case to the trial court for an evidentiary hearing on certain claims of ineffective assistance of counsel. The hearing was held on August 8, 2000. The trial court soon thereafter entered its findings of fact and conclusions of law. The OCCA affirmed Petitioner's conviction and death sentence in a published opinion dated May 24, 2001. Abshier v. State, 2001 OK CR 13, 28 P.3d 579 (Okla. Crim. App.). Petitioner's subsequent petition for writ of certiorari to the United States Supreme Court was denied on April 15, 2002. Abshier v. Oklahoma, 535 U.S. 991 (2002). Petitioner filed an Application for Post-Conviction Relief which was denied by the OCCA in an unpublished opinion dated June 8, 2001. (Case No. PCD-1999-1459.)

## II. FACTUAL BACKGROUND

Under 28 U.S.C. § 2254(e), when a federal district court addresses "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court, a determination of a factual issue made by a State court shall be presumed to be correct." 28

U.S.C. § 2254(e)(1). For the purposes of consideration of the present Petition, the Court

provides and relies upon the following synopsis from the OCCA's opinion summarizing the

evidence presented at Petitioner's trial. Following review of the record, trial transcripts, and

the admitted exhibits, the Court finds this summary by the OCCA is adequate and accurate.

The Court therefore adopts the following extensive and thorough summary of the facts as its

own:

> The victim in this case, Ashley Nicole Abshier, was born May 25, 1993.
> At the time she was murdered on March 30, 1995, she was twenty-two (22)
> months old and weighed twenty-two (22) pounds. She was the natural
> daughter of Stephanie Abshier and the Appellant, Steven Lynn Abshier.
> Stephanie married Appellant around June of 1993. By the fall of 1994, the
> three were living in Eufaula, Oklahoma. Stephanie was working at
> McDonalds, and Appellant normally stayed home with Ashley. Stephanie did
> not drive and was completely dependent upon Appellant to drive her to and
> from work, and to take care of Ashley while she was at work.
>
> Sherrie Casey, the mother of a friend of Appellant testified that she saw
> the Abshiers every two or three days in Eufaula and felt like a grandmother to
> Ashley. Once, in the fall of 1994, she saw Appellant, in Casey's front yard,
> grab Ashley by the arm and then kick her hard enough to knock her down. In
> response to that incident Casey placed an anonymous telephone call to the
> Department of Human Services to report the abuse she had seen Appellant
> inflict on Ashley.
>
> Another time it appeared Appellant may have hit or pushed Ashley
> while he was arguing with his wife, knocking Ashley out of the car into the
> street in front of Casey's house where she skinned her face. Casey wasn't
> certain that he hit her or pushed her that time, but she saw Ashley, who was
> between Stephanie and Appellant, climb over him and fall out onto the street
> while the parents were arguing. This would have been the only time she saw
> Appellant abuse Ashley in the presence of Stephanie, but she was not sure it
> was abuse that time. Appellant once told Casey he would whip or beat Ashley
> until she learned how to use the toilet.

It did not appear to her that the Department of Human Services had responded to her first call, so she made a follow-up call to find out what was being done about the abuse.

Another time she had seen Appellant, while in the front seat of the car, grab Ashley by the arm, and throw her from the back seat into the front seat. Later that same day, while baby-sitting Ashley, Casey changed Ashley's diaper. Ashley started crying and Casey observed bruises all over her – on the top part of her legs, face, stomach, bottom, and arms, many of which were apparently not visible until she removed her clothing and diaper. Casey also observed that Ashley seemed to be protecting her left arm. Casey made another anonymous call to the Department of Human Services to report the abuse she had observed that day. This was apparently the call received by Curt Been.

Stephanie Abshier testified that in the fall of 1994 she had noticed bruises and injuries to the child, but had never seen Abshier hurt her. Appellant would tell her different stories as to how Ashley became injured, and she said she believed him at the time. She noticed that the child began to react differently to him. When only Stephanie was around, Ashley would be happy, and "she was all right." But when Appellant was around and he was holding her, she would appear sad and afraid of her dad. She would start crying and would start screaming, "Mommy, mommy."

Near the end of October 1994, an incident occurred in their car in the Wal-Mart parking lot. Stephanie and Ashley had been shopping while Appellant waited for them in the car. He got mad because of something Stephanie had bought for Ashley. Ashley started crying, and he told her, "Just shut up, you stupid, little, fucking, whining brat," and he hit her on her left arm.

Curt Been, a Department of Human Services worker in Eufaula, took the anonymous call about Ashley in October of 1994. He assigned the case Priority I, the highest priority, and although the call came in at 5:00 p.m., he went out to Abshier's house with a police officer that day. Mr. Been met Appellant, Stephanie, and Ashley at the home and observed Ashley. He saw a knot on Ashley's forehead which Appellant said was caused when she was running through the house and tripped and fell. The Abshiers had not taken her to a doctor.

Ashley was able to raise her arms without apparent pain. She was wearing a tee-shirt and terry cloth shorts. Been and the officer did not look for injuries on the parts of her body that were covered by her clothing.

Because he had not seen any more injuries on her, Been and the officer determined there was not enough to take the child then, but Been told the parents to have her examined at the clinic just to make sure she was okay. The parents agreed they would take her to the Indian clinic in Eufaula.

The next day, Been checked with the clinic and found that Appellant had not yet taken Ashley there. Been got another officer from the police department and returned to the Abshiers' house to find out why. After Been knocked for some time, Appellant answered the door. He looked like he had just woke up, but insisted, "I'm going to take her." Been called the clinic when he got back to his office and verified that the Abshiers had arrived at that time. Stephanie testified Appellant was the one who took Ashley to the Indian clinic while she, Stephanie, was at work.

The clinic transferred Ashley to St. Francis Hospital in Tulsa, Oklahoma. Dr. Boone, an orthopedic surgeon, testified that he saw Ashley November 1, 1994, at St. Francis Hospital. She had been brought in the night before. He verified that her upper left arm was broken, a fracture of the upper humerus with minimal displacement, and she had multiple contusions or bruises. According to the history given by the mother at the emergency room, the father stated the child tripped over a tool box. Stephanie also testified at trial that Appellant had told her the same thing.

Dr. Boone said that normally a simple fall would not produce enough energy or velocity in a child of Ashley's age with healthy bones to fracture the humerus. Ashley's bones otherwise appeared healthy. Dr. Boone also testified that tests had been performed at St. Francis Hospital November 1, 1994, that showed that Ashley did not bruise more easily than normal. He believed that Ashley's injuries were secondary to blunt trauma, and by history, secondary to child abuse. For a person to cause that kind of fracture with a hand or fist would require most of their force. Such a fracture could be caused by someone slinging a child by the arm.

Stephanie wrote out a statement of what had happened, and based upon her agreement to leave Appellant, Ashley was allowed to remain with her. Stephanie went to stay at her father's house with Ashley.

In December of 1994, Appellant got back together with Stephanie. In mid-January 1995 they moved with Ashley to Oklahoma City to avoid being found by the Department of Human Services. The Department issued a pick-up order for the child.

Initially, in Oklahoma City, they stayed at the house of a friend, Ed Banister, before moving into their own house at 1802 South Stonewall. Stephanie got a job at Hardee's restaurant near 74th Street and South Pennsylvania Avenue. Abshier stayed home to take care of Ashley.

On the evening before Ashley died, the Abshiers ate dinner at Ed Banister's house. They returned home by 9:00 or 9:30 p.m., but Appellant left again, returning some time around 4:00 or 4:30 the next morning.

On March 30, 1995, Stephanie awoke at approximately 5:00 a.m. and was supposed to be at work by 6:00 a.m. However, she was not able to awaken Appellant to take her to work, so she went back to sleep. She woke up again at 9:00 a.m. and was able to wake Appellant, and he drove her to work.

The Hardee's manager, Mary Gilbert, testified that Stephanie was scheduled to come in at 6:00 a.m. but didn't clock in until 9:32 a.m. The time was verified by the personnel time tape. Gilbert further testified, "[Stephanie] said that her husband was out all night with the landlord and he was late getting back and couldn't get her to work."

Appellant returned to Hardee's, with Ashley, after lunch time. She did not appear injured at that time to the manager, Mary Gilbert, or to the co-employee, Fred Toliver, or to Stephanie. Appellant asked Stephanie to get him and Ashley something to eat. Stephanie told him to wait, that she thought there was some food in the house, and that she would see about getting some food to take home when she got off work that evening. Stephanie testified he became really angry, and "he just like stormed out of the door," carrying Ashley. Ms. Gilbert also testified that Appellant was upset when he left, and that, "He kind of slammed the door – and rushed out."

Around 2:00 p.m., Nancy Connelly, a neighbor of Appellant saw him walk out of his house alone, carrying something that looked like a blanket and push it into the trunk of his car before slamming the trunk lid down. She described the car as an old noisy, "[w]hite and light blue T Bird, rusted and beat up."

When he looked over at Connelly, he looked surprised or nervous. He started up his car and "revved the motor and took off like he was in a hurry . . . and you could hear him squealing the tires down the street." When the police searched his car after his arrest, they did not find a blanket in the trunk. There was no other testimony about Abshier's or Ashley's whereabouts between 1:00 and 5:00 p.m.

Around 5:00 p.m., Appellant was parked in front of the front door at Hardee's. He saw Toliver in the parking lot, and demanded that he go get Stephanie. Toliver was heading to his car to leave. Abshier was sitting in his car and had the baby on his shoulder, wrapped in a blanket.

Stephanie came out and went to the passenger side of the car. Toliver heard her say, "What did you do to my baby?" She got in the car and starting hitting her hands on the dashboard and yelling.

Stephanie testified she saw some blood on Ashley's face, and when she asked Appellant what happened, he told her "that he took her to a park and she-they were-she was playing and that some man pulled up on the curb [in a black LTD] and hit her" with the car. He told her it was a black man, and that he must have been drunk. He told her that he chased the car but "didn't ever get a tag number or anything like that." When Stephanie asked him why he hadn't taken Ashley to the hospital, he became angry and told her to "shut the flying fuck up." He kept repeating that while she was upset and screaming.

Toliver said they sat there for a second arguing and then they pulled out in front of him and headed north on Pennsylvania Avenue, the same direction that he was traveling home. He saw them pass Hillcrest Hospital, and when he turned off at Youngs Boulevard, they continued north on Pennsylvania.

When they arrived at Southwestern Medical Center, Stephanie ran into the hospital screaming, "My baby's hurt." She told Francis Bradstreet, the triage nurse, that the child was coming in. Abshier brought Ashley in and handed her to Bradstreet.

Bradstreet testified that Ashley's body was cold to the touch, her pupils were dilated, and she was not breathing. "Her face was a mess, just torn away, and she was just purple." Abshier did not have a lot of emotion and was not agitated. He told Bradstreet the child had been run over by a car.

Bradstreet contacted the on-call doctor, Dr. Brent Wauter, who "immediately ran to the room where [Bradstreet] had the child and started assessing the child." Bradstreet observed bruises behind Ashley's ears and what appeared to be a hand mark to the front of her chest. Ashley's body temperature was 88.4 degrees. After the initial assessment, Dr. Wauter pronounced Ashley dead.

Dr. Brent Wauter testified about his examination of the child. At the time Ashley arrived at the hospital, she had liver mortis and rigor mortis. Her body was so stiff that when he lifted her heels, it lifted her entire body all the way to her head without any bend in her buttocks or neck. In Dr. Wauter's opinion, she had been dead "for some time."

Wauter is board certified in Emergency Medicine which requires five years experience and passing a written and oral examination. He testified that Ashley had been beaten, and her injuries could not have been the result of an auto-pedestrian accident. If she had been hit by a car, he would have expected to have seen "more massive head injury, crush injuries, [and] tearing of flesh," and "road debris, grease, [and] blood" on her clothing. None of these indications were present. Dr. Wauter concluded the child had been dead for several hours before 5:00 p.m. Her injuries would have required a "blow delivered from an average adult human with no restraint; all their force."

He questioned Abshier and Stephanie. Abshier said that he was the only one with Ashley all day and that they had gone to the park where a car had jumped a curb and hit her. Dr. Wauter testified: "Except for gripping the arms of the chair, he showed no emotion whatsoever, an exceptionally flat affect."

Dr. Wauter spoke with the Abshiers together – and told them Ashley was dead. Stephanie "became extremely angry and hysterical, and screamed [at Abshier], 'You killed her.'" She was taken to a separate room because "[s]he physically was going to attack" her husband. Abshier gave no visible reaction to the news that Ashley was dead.

Dr. Wauter told the secretary to call the police. Appellant glanced at the door several times and the doctor had the impression that he might try to flee. Dr. Wauter pulled a pair of handcuffs out of a drawer and told him, "Just give me your hands." Appellant complied and said, "What's this?" Dr. Wauter personally handcuffed Abshier and told him "You're under arrest." Abshier's demeanor stayed the same.

Police Officer Terry Harrison of the Oklahoma City Police Department Fatality Accident Investigation Squad testified that in his opinion there wasn't any way Ashley's injuries could have been caused by a car hitting her. He examined Ashley's body along with Dr. Wauter at the hospital the day of her death. His conclusion was, "That her wound or her injuries were not consistent with a pedestrian type accident." He had over twenty (20) years experience in accident investigation, and had investigated well over 5,000 accidents.

Oklahoma City Detective Sam Duke went to the hospital March 30, 1995. He sealed Abshier's car with evidence tape, then took pictures of the exterior. He had another officer stay with the car while he went inside and took pictures of Ashley's body. When the wrecker came, he went back outside and followed Appellant's car to Police Headquarters, where it was secured in the police garage. He also went to the Abshier residence at 1802 South Stonewall, where another officer was standing by guarding it, and secured and photographed the exterior. He also collected boots and other items of clothing and personal property from Abshier. He delivered the evidence he had collected and additional items he had picked up from the medical examiner's office to the police serology department.

Police Officer Charles Goforth, with other officers, searched Appellant's residence and automobile for blood and other physical evidence. He photographed the exterior and interior of both the house and the car and he and the other officers collected all items they found that had apparent evidentiary value, such as blood stains or hairs. Joyce Gilchrist, a forensic chemist for the police department, also helped collect evidence at the house.

Detective Dexter Nelson observed Abshier at the hospital. He was familiar with the behavior of persons under the influence of methamphetamine, and testified that nothing in Abshier's demeanor indicated he was high on methamphetamines. "[Appellant] was calm, quiet, reluctant to speak." Nelson said, "There was no indication that he was high or under the influence of anything, to my knowledge."

Nelson also observed the facial injuries on Ashley's body, and on cross-examination stated: "We didn't know exactly what it was. It did appear that it could have been a – a liquid type burn, a friction burn, or we even considered maybe something being placed on the face and ripped off, like tape." Counsel asked, "You had seen injuries similar to this which were burns, correct?" Nelson answered, "I've seen liquid burns that were similar to this."

Dr. Choi, the medical examiner, testified that in addition to numerous other bruises on her head and body, Ashley had nine different fresh subgaleal (beneath the scalp) hemorrhages. She had died from injury to the head causing swelling of the brain. The skin was denuded from a large area of her face. Dr. Choi said this and the marks on Ashley's face and head appeared consistent with her being held face down by something, such as a shoe, and being stomped. She testified that in her opinion Dr. Wauter's theory, that the application and forceful removal of duct tape from Ashley's face could have caused the removal of the skin, was possible. However she stood by her own theory. Dr. Choi found the fatal injuries consistent with Shaken Baby Syndrome.

During the second stage of trial, the trial court granted the State's motion to incorporate all evidence from the first stage of the trial into the second stage. In addition, the prosecution presented the victim impact statements of April Cockerhan, Ashley's step-grandmother, and of David Cockerhan, Ashley's grandfather. The testimony of each took about one page of transcript, and there was no cross-examination.

Dr. John Stuemky, a pediatrician, testified that the injuries to the child would have been painful, that children Ashley's age do not bruise easier than adults, and that the injuries on Ashley were too numerous to count. He is Board certified in the area of Emergency Pediatrics. He is Chief of the Service of General Pediatrics for Children's Hospital and Medical Director of Emergency Services. He developed the Hospital's child abuse program in the early 1970's and developed the curriculum for child abuse for their medical students as well as their residents of pediatrics.

Dr. Stuemky testified further that one would expect a child to be conscious during most of the injuries because abuse usually starts in response to the infant's crying and whining, and once the child becomes unconscious and stops crying and whining, the abuse also stops. The doctor's testimony was based on over twenty-two (22) years of experience with abused children, interviews with many, many perpetrators, and from studies in the literature and studies in his own experience.

Appellant presented Dr. Wanda Draper in the second stage who testified about Appellant's history from the records she had reviewed and interviews she had conducted. Although Appellant's natural father was claimed to be an alcoholic and abusive to Appellant's mother, he left when Appellant was still a young child. His mother then married Billy Clock, who

was a good step-father. Appellant had a normal life style until he got into drugs and alcohol in high school. Abshier told her he had used marijuana, crank, methamphetamine, and peyote while in school. He lived with a woman for two years, and they had twin sons. Abshier's mother paid for him to go through a rehabilitation center, but he got involved with marijuana, cocaine, methamphetamine, and other drugs again, and was heavily using methamphetamine at the time of his arrest, or at least several months before. She testified that Abshier and his mother gave inconsistent stories to her about his history.

Dr. Draper said Appellant also gave her multiple stories about what happened the day Ashley was killed. At first, he stuck with his story that Ashley was run over by a car. Later, he told her he had been on "meth" and that he impulsively exploded. He told her that "he hit the child and knocked the child down and knocked the child to the ground," and that he "lost control."

Dr. Philip Murphy testified about neuropsychological examinations of Abshier. His full scale IQ of 83 indicated dull average, and he had a mild learning disability. Tests did not show him to be typically aggressive and did not show him to be an anti-social personality. Nevertheless, if the situation were set up right, Abshier could "blow," and violence would then occur. Use of methamphetamine would make one mean and angry, and there would be a greater tendency to be aggressive under influence of the drug. On cross-examination, he agreed Abshier could be manipulative. It would not surprise him to hear that Abshier had hit his wife.

Dr. J.R. Smith, the medical director of the psychiatric unit of Integris Hospital, testified for the defense. He had examined Abshier and found he had a history of severe anxiety, intermittent depressive episodes, and severe alcohol and drug dependency.

Appellant told him he was talking on a car phone and was in a rage about some people who owed him money but who had lied to him. (Stephanie had testified that they had no car phone, and the police did not find one in his car or house.) Appellant said because of the rage welling up in him and the methamphetamine he was using, and because Ashley sensed his rage and began whining, he grabbed her by the hair and neck and slammed her down on the floorboard. When Appellant took her into the house, it dawned on him that she was probably dead. He picked up a cloth by the kitchen sink near a can of Drano, wet the rag, and harshly wiped Ashley's face with it; the skin of her

face appeared to come off. Dr. Smith admitted on cross examination that parts of Appellant's story were not consistent with the physical evidence and this was one of those parts. Smith said that he believed some of the things Abshier told him, and some of the things he did not believe. Abshier told Dr. Smith he then took the child to his wife's work and then to the hospital.

Dr. Smith did not think that Abshier would be a future threat in prison because it was a controlled setting where he would have no access to methamphetamine and because there were no children in prison.

Abshier's final witness was his mother, Celia Johnson, a private duty nurse. She could not believe Abshier would abuse Ashley. She thought Abshier had many good qualities and was a very loving and dependable person.

Abshier v. State, 28 P.3d 579, 587-92 (Okla. Crim. App. 2001)(footnotes omitted).

Additional facts and testimony were submitted to the jury at trial and presented at the evidentiary hearing not contained herein or in the OCCA's summary. Additional facts necessary for a determination of Petitioner's claims will be set forth in detail throughout this Opinion where applicable.

## III. PETITIONER'S CLAIMS FOR RELIEF

## A. THE STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order to obtain federal habeas relief once a state court has adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. §2254(d)(1-2).

The Supreme Court defined "contrary to" as a state-court decision that is "substantially different from the relevant precedent of this Court." Williams v. Taylor, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and delivering the opinion of the Court). A decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405. The "unreasonable application" prong comes into play when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. The "AEDPA's purpose [was] to further the principles of comity, finality and federalism. There is no doubt Congress intended AEDPA to advance these doctrines." Williams v. Taylor, 529 U.S. 420, 436 (2000).

## B. GROUNDS FOR RELIEF.

Ground 1:    Ineffective Assistance of Trial Counsel.

In his first ground for relief, Petitioner claims trial counsel abandoned his role of an advocate by conceding Petitioner's guilt without an on-the-record inquiry about whether a knowing and intelligent waiver of rights existed, amounting to an actual or constructive denial of counsel in violation of <u>Cronic v. United States</u>, 466 U.S. 648 (1984), and <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Respondent responds that Petitioner has not demonstrated that the OCCA's adjudication of his claim was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

On direct appeal, Petitioner raised his claim of ineffective assistance of counsel for conceding guilt in the first stage of trial. After remand for an evidentiary hearing on the issue, the OCCA denied Petitioner's claim. Although lengthy, the Court deems it necessary to include the OCCA's thorough analysis of Petitioner's claim in its entirety:

> Appellant contends in his first proposition of error that his trial counsel's "frank admission of guilt" during voir dire and first stage closing argument deprived Appellant of his right to counsel under the Sixth Amendment to the United States Constitution and his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution.

> We have adopted the two-prong test for effective assistance of counsel set out by the United States Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). First, a defendant must show that his attorney's performance was so deficient that the defendant was, in effect, denied counsel as guaranteed by the Sixth Amendment. Second, the defendant must show that the attorney's deficient performance prejudiced the trial to the extent that the defendant was denied a fair trial. <u>Id.</u>, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. <u>See</u>, <u>e.g.</u>, <u>Powell v. State</u>, 1995 OK CR 37, ¶ 62, 906 P.2d 765, 780, <u>cert. denied</u>, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996).

In Strickland, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694, the Court held: "Judicial scrutiny of counsel's performance must be highly deferential." Further, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Id.

Further, "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." Id., 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Counsel has a duty to advocate the defendant's cause, to consult with the defendant on important decisions, and to keep the defendant informed of important developments. Id., 466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

Appellant's counsel told the jury during voir dire:

"I feel I at least owe you an explanation for why I went to the heart of the matter, which is the death sentence, and that's because Steven Abshier committed child abuse murder and the State will prove it beyond a reasonable doubt. We are here for sentencing and sentencing only, and this is a horrendous crime that has been committed and the D.A. has the upper hand. I feel like I'm at the foot of a mountain looking up at my goal, which is a fair trial for my client. . . . I just want to ask you questions and hopefully reach my goal, which is a fair trial for Steven Abshier. And if that occurs, then the justice system has worked."

Trial counsel further told the jury in first stage closing argument:

"[W]e certainly probably could have tried to run some kind of defense, but there's no point in trying to deceive you or make you look like fools by presenting a defense that is not believable, and so we didn't. And we told you that he did it, and I know it's difficult in a case like this as jurors to sit through evidence in the first stage knowing that his lawyer stood up and said he did it, but I felt that that was the way it should have been done and I did it that way."

Appellant claims that this constituted ineffectiveness of counsel, *per se*. We have ruled otherwise on past occasions.

Appellant admits that we did not hold in Collis v. State, 1984 OK CR 80, 685 P.2d 975, a non-capital case, that conceding guilt during closing argument was per se ineffective. Id. at 977. We held in Wood v. State, 1998 OK CR 19, ¶ 60, 959 P.2d 1, 16, a capital case:

> "In light of the overwhelming evidence against Appellant, trial counsel may have decided not to overstate his case lest he lose credibility for the second stage where he would need it the most. A fine trial lawyer may well decide that guilt could not be doubted and save the best for saving his life. We do not find counsel's performance deficient under the circumstances."

We also held in Hale v. State, 1988 OK CR 24, ¶ 48, 750 P.2d 130, 142, another capital case:

> "Appellant also claims that counsel admitted his client's guilt during first stage closing arguments. [Footnote: "In closing argument, defense counsel stated, 'There isn't any doubt that Jim Hale was involved in this. No doubt whatsoever. How much though? To what extent?'"] We have held that conciliatory remarks of counsel may show ineffective assistance, Collis v. State, 685 P.2d 975 (Okl.Cr.1984), but we find nothing prejudicial in counsel's statement. Claiming that the appellant had not been involved at all would have completely destroyed counsel's credibility before the jury in light of overwhelming evidence of appellant's identity and testimony that appellant was apprehended with the ransom money after a chase by law enforcement officials.[sic] only possible method of gaining an acquittal on either charge." (Emphasis added.)[3]

We also ruled on counsel's concession of his client's guilt in the case of Trice v. State, 1996 OK CR 10, ¶ 19, 912 P.2d 349, 355. "In light of the

---

[3] The correct quotation of the last sentence of the quoted paragraph from Hale reads: "From the record, it appears that minimizing appellant's role was the only possible method of gaining an acquittal on either charge."

fact that Trice confessed to having raped the victim, we find that his trial attorneys' strategic decision to concede guilt was neither unreasonable nor prejudicial."  Trice was convicted of murdering the same victim he had raped, and was sentenced to death.

In some circumstances, such as the one here, where the defendant has confessed and the evidence is overwhelming, it could be reasonable trial strategy to candidly concede guilt early in the trial in order to establish credibility with the jury in the hope that at least one juror can be persuaded to vote for a sentence less than death in the penalty stage.  It was also reasonable in this case to focus the issues in voir dire to find out which jurors would automatically vote for the death penalty.

It was clear that Abshier could not hope to win in the guilt or innocence stage.  He had told a story that Ashley had been hit by a car, but this was controverted by the physical and medical evidence, and police accident experts.  He had then changed his story and admitted to at least two witnesses that he had been in a rage and had struck Ashley.  It was proper trial strategy for counsel not to destroy his credibility in the first stage, but to focus his efforts on obtaining a "Life Without Parole" sentence rather than "Death."

On the same day <u>Strickland</u> was decided, the Supreme Court handed down <u>United States v. Cronic</u>, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984), a case cited by Appellant in support of his assertion of per se ineffective assistance of counsel.  In <u>Cronic</u>, a complicated bank fraud case with many documentary exhibits, counsel had only been appointed 25 days before trial.  The Supreme Court did not decide whether Cronic had been deprived of effective assistance of counsel, but remanded the case for an evidentiary hearing pursuant to <u>Strickland</u>.  The Court stated in dicta, however, that there were situations, unlike Cronic's, where ineffectiveness of counsel would be presumed.  One was where there was no lawyer.  Another was where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." <u>Id.</u>  However, the Supreme Court has never ruled that a presumption of ineffectiveness of counsel arises where counsel concedes guilt during trial.

Counsel on appeal next suggests that the statements of trial counsel are equivalent to a plea of guilty on behalf of his client, and that the court should have made a record that the defendant knowingly and voluntarily waived his rights.  Appellant says that when a defendant pleads guilty he gives up three

important federal rights stated by the Supreme Court in <u>Boykin v. Alabama</u>, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279 (1969):(1) the privilege against compulsory self-incrimination, (2) the right to trial by jury, and (3) the right to confront one's accusers. However, when listed in this manner, it can be seen that Appellant did not plead guilty and did not surrender any of these important rights. He did not testify and did not subject himself to cross-examination; his lawyer vigorously confronted his accusers. He preserved his right to have jury sentencing, and therefore to plead to the jury for mercy.

As a matter of trial strategy, trial counsel admitted only what he knew the State could prove, so that he could maintain his credibility with the jury for the critical second stage. Had Appellant wished to plead guilty in the present case, then the mandates established by this Court in <u>King v. State</u>, 1976 OK CR 103, 553 P.2d 529, would have applied. We find from the record that he did not plead guilty, but maintained his right to jury sentencing, to confront and cross-examine the witnesses against him, to not testify, and to not be subjected to cross-examination.

<u>Abshier</u>, 28 P.3d at 592-95 (footnotes omitted).

Petitioner asserts that counsel's actions of conceding guilt were ineffective per se pursuant to <u>Cronic</u>. Petitioner contends counsel's admission that he committed child abuse murder and that the state would prove it beyond a reasonable doubt constituted an "actual guilty plea," thus failing to subject the prosecution's case to meaningful adversarial testing. Petitioner continues that in such a case there has been a denial of his Sixth Amendment rights and, as such, no demonstration of prejudice is required.

As determined by the OCCA, <u>Cronic</u> is not applicable under the facts and circumstances of this trial:

The Supreme Court in <u>Cronic</u> recognized that in rare instances it may be appropriate to presume prejudice "without inquiry into counsel's actual performance at trial," because the circumstances "are so likely to prejudice the

18

accused that the cost of litigating their effect in a particular case is unjustified." Cronic, 466 U.S. at 658, 662, 104 S.Ct. 2039. Circumstances that justify a presumption of prejudice include the absence of counsel at a critical stage of trial, the denial of the right to effective cross-examination, and the complete failure to subject the prosecution's case to adversarial testing; but, as the Supreme Court points out, a presumption of prejudice is the exception, not the rule. Id. at 659, 104 S.Ct. 2039.

Cooks v. Ward, 165 F.3d 1283, 1295-96 (10th Cir. 1998).

Cronic's "presumed prejudice" is only applicable in those cases where the attorney abandoned the required duty of loyalty to his client and acted with reckless disregard:

As noted above, Strickland requires a showing of both deficient representation and prejudice. In a narrow class of cases, however, including when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), prejudice is presumed. In order to presume prejudice under Cronic, "the attorney's failure to test the prosecutor's case must be complete." Bell, 535 U.S. at 686, 122 S.Ct. 1843. This Court has repeatedly found the Cronic presumption inapplicable where "counsel actively participated in all phases of the trial proceedings." Snyder v. Addison, 89 Fed.Appx. 675, 680 (10th Cir.2004); see also Cooks v. Ward, 165 F.3d 1283, 1296 (10th Cir.1998) (Cronic inapplicable where "[counsel] was present in the courtroom[,] . . . conducted limited cross-examination, made evidentiary objections, and gave a closing argument"); Hooper v. Mullin, 314 F.3d 1162, 1175 (10th Cir.2002) (Cronic inapplicable where "[d]efense counsel cross-examined the State's guilt-stage witnesses, made objections to the State's evidence, presented some evidence in Petitioner's defense, and made opening and closing arguments"). In fact, we have found a complete absence of meaningful adversarial testing only where the evidence "overwhelmingly established that [the] attorney abandoned the required duty of loyalty to his client," and where counsel "acted with reckless disregard for his client's best interests and, at times, apparently with the intention to weaken his client's case." Osborn, 861 F.2d at 629.

Turrentine v. Mullin, 390 F.3d 1181, 1207-08 (10th Cir. 2004)(footnotes omitted).

Petitioner's representation and trial were not a complete failure of adversarial testing. Petitioner's counsel was present in the courtroom throughout his trial, presented evidence, made evidentiary objections, conducted cross-examination, and made an opening statement and closing argument. Cronic's presumed prejudice standard is not, therefore, the proper standard to apply.

The Supreme Court set forth the proper standard for determining ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).

> In Strickland, the Supreme Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." 466 U.S. at 687, 104 S.Ct. 2052. "First," the Court noted, "the defendant must show that counsel's performance was deficient." Id. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "Second," the Court noted, "the defendant must show that the deficient performance prejudiced the defense." Id. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. "Unless a defendant makes both showings," the Court held, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.

Gilson v. Sirmons, 520 F.3d 1196, 1245 (10th Cir. 2008).

Subsequent to Petitioner's trial and appeal, the Supreme Court considered the same issues raised here by Petitioner in a case with strikingly similar facts. Although not established at the time of the OCCA's determination, the Supreme Court's reasoning is illustrative of the proper application of Cronic and Strickland when counsel decides to not deny guilt and to focus on sentencing. In Florida v. Nixon, 543 U.S. 175 (2004), the

petitioner was tried for first-degree murder, kidnaping, robbery and arson.  The state had gathered overwhelming evidence that Nixon had committed the murder in the manner he described in a confession to the police.  Prior to trial and after discovery, Nixon's appointed counsel concluded that Nixon's guilt was not "'subject to any reasonable dispute.'" Id. at 180-81.  Trial counsel focused on the penalty phase of the trial, determining that denying Nixon's guilt in the first stage of trial would compromise both his credibility with the jury and his ability to effectively seek leniency during the second stage of trial. Id.

On direct appeal, Nixon argued that trial counsel rendered ineffective assistance by conceding his guilt without obtaining his express consent.  Nixon relied on Cronic and argued the concession should be presumed prejudicial because it left the prosecution's case "unexposed to 'meaningful adversarial testing'". Id. at 185.[4]   The Supreme Court granted certiorari to resolve the question of "whether counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial automatically renders counsel's performance deficient, and whether counsel's effectiveness should be evaluated under Cronic or Strickland." Id. at 186-87.  The Court first determined that the attorney's statements at trial were not the functional equivalent of a guilty plea, in that despite the concession of guilt, Nixon retained the rights afforded to a defendant in a criminal trial. Id. at 181 (citing Boykin v. Alabama, 395 U.S. 238, 242-43 (1969)).  The state was still required to present evidence during the guilt stage of trial to establish the essential elements of the

---

[4] Nixon also contended in the alternative that the concession of guilt was unreasonable and prejudicial under the standard set forth in Strickland. Id. at 186, n. 4.

crime. The defense reserved the right to cross-examine witnesses and to seek to exclude prejudicial evidence. Further, in case of error, a concession of guilt would not hinder the defendant's right to appeal. Id. Due to these factors, and because Nixon's attorney had cross-examined witnesses and sought exclusion of prejudicial photographs, the Supreme Court first held that Nixon's attorney's concession of guilt "does not rank as a 'fail[ure] to function in any meaningful sense as the Government's adversary." Id. at 190-91. It then considered the seriousness of capital cases and the reasonableness of trial counsel's strategic decisions and held that counsel's strategy, given the evidence of Nixon's guilt, satisfied the Strickland standard and no tenable claim of ineffective assistance remained. Id. at 192.

In the instant case, trial counsel's actions were not the functional equivalent of a guilty plea. The state was still required to prove each element of the crime beyond a reasonable doubt. Despite counsel's strategic concession, Petitioner retained all the rights afforded him in a criminal trial. Accordingly, it was neither improper nor unreasonable for the OCCA to apply Strickland instead of Cronic. Strickland was clearly established federal law at the time of the OCCA's review and determination of Petitioner's claim. "In ascertaining whether the law is clearly established, we review Supreme Court holdings extant when the state court conviction became final." Fairchild v. Workman, 579 F.3d 1134, 1139 (10th Cir. 2009). Petitioner has failed to demonstrate that the OCCA's determination was either contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Petitioner's first ground for relief is denied.

Ground 2:     Acquiescence in Counsel's Concession of Guilt.

Closely related to the above claim, Petitioner claims in his second ground for relief that counsel's actions essentially were a confession of Petitioner's guilt without a voluntary and knowing waiver of his rights, thereby depriving him of due process.  Petitioner contends that the OCCA's determination that Petitioner acquiesced in counsel's "confession of his guilt" is contrary to, or an unreasonable application of, clearly established federal law.  Respondent asserts that because the concession of guilt was not a guilty plea – in reality or in effect – that the OCCA did not err in denying Petitioner's claim and that the determination was not contrary to federal law.

Petitioner asserts, as he did previously, that trial counsel's "concession/confession" is at least the functional equivalent of a guilty plea, relieving the jury of the burden of finding guilt beyond a reasonable doubt.   On appeal, the OCCA considered and then rejected Petitioner's claim that trial counsel's concession was equivalent to a guilty plea:

> Counsel on appeal next suggests that the statements of trial counsel are equivalent to a plea of guilty on behalf of his client, and that the court should have made a record that the defendant knowingly and voluntarily waived his rights.  Appellant says that when a defendant pleads guilty he gives up three important federal rights stated by the Supreme Court in Boykin v. Alabama, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279 (1969):(1) the privilege against compulsory self-incrimination, (2) the right to trial by jury, and (3) the right to confront one's accusers.  However, when listed in this manner, it can be seen that Appellant did not plead guilty and did not surrender any of these important rights.  He did not testify and did not subject himself to cross-examination; his lawyer vigorously confronted his accusers.  He preserved his right to have jury sentencing, and therefore to plead to the jury for mercy.

As a matter of trial strategy, trial counsel admitted only what he knew the State could prove, so that he could maintain his credibility with the jury for the critical second stage. Had Appellant wished to plead guilty in the present case, then the mandates established by this Court in <u>King v. State</u>, 1976 OK CR 103, 553 P.2d 529, would have applied. We find from the record that he did not plead guilty, but maintained his right to jury sentencing, to confront and cross-examine the witnesses against him, to not testify, and to not be subjected to cross-examination.

<u>Abshier</u>, 28 P.3d at 595 (footnotes omitted).

The OCCA subsequently, when considering Petitioner's ineffective assistance of counsel claim, determined counsel's trial strategy to be reasonable and that Petitioner had acquiesced in it:

We find that Appellant acquiesced in the trial strategy of his counsel where he made no effort at any time during the trial to express to the judge his disagreement with the strategy. Later, at formal sentencing, although he was not asked directly if his lawyer had served him well, the trial judge did ask him (after he had been sentenced to death) if there was anything he wanted to say. He said to the judge, "No. That's quite fine. I just want to shake your hand. It's clean. Thank you. I thought you was real fair." Appellant, although he stated at the post-trial evidentiary hearing that he was "shocked" when his counsel made the concession to the jury, never expressed to anyone during the trial, at sentencing, or at the remanded evidentiary hearing that he disagreed with the concession of guilt by his lawyer.

<u>Abshier</u>, 28 P.3d at 598.[5]

Petitioner contends that in order to save the conviction, the OCCA "departed from the clearly established precedents from the Supreme Court and relied upon Mr. Abshier's supposed acquiescence in counsel's confession of his guilt." (Pet. at 37.) Petitioner relies on

---

[5] The OCCA also noted that Petitioner has never stated whether or not he opposed or disagreed with the strategy utilized by counsel at trial. <u>Id.</u> at 597.

Boykin v. Alabama, 395 U.S. 238 (1969), in support of his contention that a silent record does not suffice to prove acquiescence to trial strategy of conceding that the state will prove the elements of the crime. Petitioner contends instead that he must have knowingly and intelligently agreed to such strategy. Petitioner's reliance on Boykin for this proposition is misplaced. In Boykin, the Supreme Court found it was error when the defendant plead guilty to five indictments at his arraignment without any questions from the judge concerning his plea or whether his decision was voluntarily and intelligently made. Id. at 239-42. While discussing the constitutional rights involved in a waiver that occurs when a plea of guilty is entered, the Court stated that "[a] plea of guilty is more than an admission of conduct; it is a conviction." Id. at 242.

In the instant case, Petitioner did not give up any rights when counsel expressed to the jury that the state would prove the elements of the crime. He did not give up his right to not take the witness stand, his right to a trial by jury, or his right to confront his accusers. These are the rights which the Supreme Court in Boykin refused to presume waived from a silent record. Id. at 242-43.

Utilizing somewhat contorted reasoning, Petitioner claims that counsel's statements, as his agent, amounted to a confession and is a concession of material fact by counsel sufficient to overcome the presumption of correctness which normally attaches to a state court finding of fact in a habeas case. As to the purported confession, he relies on the rule expressed by the Supreme Court in Jackson v. Denno, 378 U.S. 1774 (1964), that:

> a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession, Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760, and even though there is ample evidence aside from the confession to support the conviction. Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029; Stroble v. California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872; Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975. Equally clear is the defendant's constitutional right at some stage in the proceedings to object to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness, a determination uninfluenced by the truth or falsity of the confession. Rogers v. Richmond, supra.

Id. at 376-77.

Although the rule in Jackson is firmly established, it applies to confessions offered by the prosecution and objected to by the defendant. The Fourteenth Amendment forbids the use of involuntary confessions:

> not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will,' Blackburn v. Alabama, 361 U.S. 199, 206-207, 80 S.Ct. 274, 280, 4 L.Ed.2d 242, and because of 'the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' Spano v. New York, 360 U.S. 315, 320-321, 79 S.Ct. 1202, 1205-1206, 3 L.Ed.2d 1265.

Id. at 385-86.

In this case, the statements made by trial counsel were neither a confession nor were they obtained and offered by the state. Petitioner's change in terminology from comparing trial counsel's concession being "the functional equivalent of a guilty plea," to a

26

"confession," does not transform the statements from what they are – conduct of counsel properly reviewed under the standard for ineffective assistance. The statements also lack one of the necessary elements of an involuntary confession, namely, coercion by the state. Petitioner has failed to provide any clearly established federal law as determined by the Supreme Court supporting his contention that statements of counsel amount to a confession by his client. Further, Petitioner has failed to demonstrate the OCCA's determination to be unreasonable. Indeed, the OCCA's treatment of the issue reasonably views the conduct of counsel in light of the circumstances faced at trial – overwhelming evidence of guilt of a gruesome crime, including testimony of two highly credible witnesses to whom Petitioner admitted he attacked the child victim. Petitioner's second ground for relief is denied.

<u>Ground 3:</u>    <u>Proportionality of Death Sentence to Crime of Child Abuse Murder</u>.

In his third ground for relief, Petitioner claims his sentence of death is disproportionate to the crime of child abuse murder because the statute does not require a specific intent to kill. He further claims the OCCA unreasonably determined that no culpability determination was necessary.

The Eighth Amendment prohibits "imposition of the death penalty on one ... who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." <u>Enmund v. Florida</u>, 458 U.S. 732, 797 (1982); <u>see also</u> <u>Tison v. Arizona</u>, 481 U.S. 137, 158, (1987)(clarifying that death penalty may be imposed on felony murder

defendant who was not actual killer and who had no specific intent to kill, if evidence shows "major participation in the felony committed, combined with reckless indifference to human life"). Petitioner contends that this principle bars imposition of the death penalty for his child abuse murder conviction, because "[t]he State of Oklahoma has claimed the authority to execute a person without a finding that [sic] person intended to kill, intended to harm, or intended to commit any enumerated felony." (Pet. at 45.)

> To be convicted of first degree child abuse murder in Oklahoma, a jury must find that the defendant willfully or maliciously injured, tortured, maimed, or used unreasonable force on a child, and that the child died as a result. Okla. Stat. tit. 21, § 701.7(C). The jury need not find that the defendant intended to kill the child. Cf. Malicoat v. State, 992 P.2d 383, 395 (Okla.Crim.App.2000) (child abuse murder is a general intent crime). Child abuse murder in Oklahoma does not require the jury to find that the defendant intended to kill his victim, but rather the crime is a type of felony murder.

Workman v. Mullin, 342 F.3d 1100, 1110 (10th Cir. 2003).

In Enmund, the defendant was convicted of first degree murder and robbery of two elderly persons and was sentenced to death. The defendant, however, was merely the driver of the vehicle used to escape from the scene of the crime. The defendant "did not kill or attempt to kill". Enmund, 458 U.S. at 798. The issue in Enmund was "whether death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life." Id. at 787. The Enmund Court held that the imposition of the death penalty in that circumstance was inconsistent with the Eighth and Fourteenth Amendments. Id. at 788. In support of its decision, the Supreme Court stated:

For purposes of imposing the death penalty, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt. Putting Enmund to death to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just deserts.

Id. at 801.

The Supreme Court in Enmund focused on Enmund's actions in determining the appropriateness of the death penalty:

The focus must be on his culpability, not on that of those who committed the robbery and shot the victims, for we insist on "individualized consideration as a constitutional requirement in imposing the death sentence," Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978)(footnote omitted), which means that we must focus on "relevant facets of the character and record of the individual offender." Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

Id. at 798.

The necessity of focusing on the actions of the defendant in order to impose the death penalty was further advanced by the Supreme Court in Cabana v. Bullock, 474 U.S. 376 (1986). In Bullock, the defendant was found guilty of first degree murder under a Mississippi statute defining felony murder. There, however, the defendant was found to have had a much more active role in the death of the victim.[6] The Supreme Court, recognizing Enmund's

---

[6] After an argument ensued between the victim and another individual, the defendant, Bullock, attempted to grab the victim, followed the victim as he attempted to escape, and held the victim's head as the other individual struck the victim with a whiskey bottle. After the victim was killed by the other individual, Bullock assisted in disposing of the body and kept the victim's car for himself. Bullock, 474 U.S. at 379.

holding, identified the issue to be decided as "in whose hands the decision that a defendant

possess the requisite degree of culpability properly lies." Id. at 378.[7] The Court stated:

> The Eighth Amendment is satisfied so long as the death penalty is not imposed upon a person ineligible under Enmund for such punishment. If a person sentenced to death in fact killed, attempted to kill, or intended to kill, the Eighth Amendment itself is not violated by his or her execution regardless of who makes the determination of the requisite culpability; by the same token, if a person sentenced to death lacks the requisite culpability; the Eighth Amendment violation can be adequately remedied by any court that has the power to find the facts and vacate the sentence.

Id. at 386.

In Tison v. Arizona, 481 U.S. 137 (1987), the Supreme Court considered the issue of

"whether the Eighth Amendment prohibits the death penalty in the intermediate case of the

defendant whose participation is major and whose mental state is one of reckless indifference

to the value of human life." Id. at 152. The Court held:

> We will not attempt to precisely delineate the particular types of conduct and states of mind warranting imposition of the death penalty here. Rather, we simply hold that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement.

Id. at 158.

In Hatch v. State, 58 F.3d 1447 (10th Cir. 1995), the Tenth Circuit stated:

---

[7] In its discussion of Enmund, the Court stated:

[O]ur ruling in Enmund does not concern the guilt or innocence of the defendant – it establishes no new elements of the crime of murder that must be found by the jury. Rather, as the Fifth Circuit itself has recognized, Enmund "*does not affect the state's definition of any substantive offense, even a capital offense*."

Id. at 385 (citations omitted)(emphasis added).

On federal habeas review of a state court's disposition of this issue, however, our review is circumscribed:

> [T]he court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made. If it has, the finding must be presumed correct by virtue of 28 U.S.C. § 2254(d), and unless the habeas petitioner can bear the heavy burden of overcoming the presumption, the court is obliged to hold that the Eighth Amendment as interpreted in Enmund is not offended by the death sentence.

Cabana, 474 U.S. at 387-88, 106 S.Ct. at 697-98 (footnote and citation omitted); see also Hopkinson, 866 F.2d at 1215 (quoting the same).

Hatch, 58 F.3d at 1470.

The Supreme Court has restated that Enmund did not establish any new substantive elements of a capital crime, and that the necessary finding of culpability may be made at any stage of the proceedings, including during sentencing or on appeal. See Hopkins v. Reeves, 524 U.S. 88, 100 (1998); see also Cabana v. Bullock, 474 U.S. at 392.

On appeal, the OCCA considered Enmund, Tison and Bullock, and then determined that their requirements did not apply and the state court did not need to determine whether Petitioner was a "major participant in a felony and exhibited reckless indifference to human life," as he had, acting alone, actually killed his daughter. Abshier, 28 P.3d at 608. The state court further applied the reasoning of Hopkins v. Reeves, 524 U.S. 88 (1998)(upholding the death penalty in a Nebraska case where neither the felony murder statute nor the underlying felony required proof of intent), as additional support to deny Petitioner's claim for relief. Id. at 609.

Petitioner has failed to demonstrate the OCCA's determination to be unreasonable. The death sentence is not disproportionate to the crime of child abuse murder; Petitioner actually killed his daughter. The Tenth Circuit has held that the Eighth Amendment's culpability determination has been satisfied when a felony murderer has actually killed his victim:

> Workman's crime falls into the category of cases under Enmund in which a felony murderer has "actually killed" his victim. See id. at 150, 107 S.Ct. 1676. The phrase "actually killed, attempted to kill, or intended to kill" or variations thereof is repeated at least nine times in Enmund, 458 U.S. at 797, 793 n. 15, 795, 796, 797, 798, 799, 801, is repeated at least three times in Tison, 481 U.S. at 148, 150, 152 n. 4, and is repeated at least twenty times in Cabana v. Bullock, 474 U.S. 376, 378, 383, 384, 385, 386, 387, 387 n. 4, 388 n. 5, 389, 390, 391, 391 n. 6, 392, 392 n. 7, 106 S.Ct. 689, 88 L.Ed.2d 704. In short, the iteration of this test has been carefully formulated by the Supreme Court and often reaffirmed. Accord also Revilla v. Gibson, 283 F.3d 1203, 1210 (10th Cir.2002) (quoting language in Enmund requiring that a defendant "himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed"). The significance of falling into Enmund's category of when a felony murderer has "actually killed" his victim is that the Eighth Amendment's culpability determination for imposition of the death penalty has then been satisfied. Cabana, 474 U.S. at 386, 106 S.Ct. 689 ("If a person sentenced to death in fact killed ... the Eighth Amendment itself is not violated by his or her execution.").

Workman, 341 F.3d at 1111-12. "We now hold that the constitutional check that Enmund, and certainly that Tison, represent is satisfied in felony murder cases in which the defendant actually killed his victim." Id. at 1114. The OCCA was not unreasonable in finding it was not necessary to make a culpability determination under the facts of this case. Petitioner's third ground for relief is denied.

Ground 4:     Ineffectiveness of Counsel During Second Stage of Trial.

In his fourth ground for relief, Petitioner claims his counsel were ineffective in the second stage of trial because they failed to marshal the evidence for the penalty phase, presented an unfocused and conflicted closing argument, undercut Petitioner's case for a sentence less than death, and failed to locate relevant mitigating witnesses. Petitioner further claims the OCCA's determination of these claims to be unreasonable.

To prevail on a claim of ineffective assistance of counsel under the Sixth Amendment, Petitioner must first show that his counsel "committed serious errors in light of 'prevailing professional norms'" in that the representation fell below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 688 (1984). In so doing, Petitioner must overcome the "strong presumption" that his counsel's conduct fell within the "wide range of reasonable professional assistance" that "'might be considered sound trial strategy,'" Strickland, 466 U.S. at 689, quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955). He must, in other words, overcome the presumption that his counsel's conduct was constitutionally effective. United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993). A claim of ineffective assistance "must be reviewed from the perspective of counsel at the time," Porter v. Singletary, 14 F.3d 554, 558 (11th Cir.), cert. denied, 513 U.S. 1009 (1994), and, therefore, may not be predicated on "'the distorting effects of hindsight.'" Parks v. Brown, 840 F.2d 1496, 1510 (10th Cir. 1987), quoting Strickland, 466 U.S. at 689.

If constitutionally deficient performance is shown, Petitioner must then demonstrate that "there is a 'reasonable probability' the outcome would have been different had those

errors not occurred." Haddock, 12 F.3d at 955; citing Strickland, 466 U.S. at 688, 694; Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). In the specific context of a challenge to a death sentence, the prejudice component of Strickland focuses on whether "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; quoted in Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir. 1992), cert. denied, 507 U.S. 929 (1993). Petitioner carries the burden of establishing both that the alleged deficiencies unreasonably fell beneath prevailing norms of professional conduct and that such deficient performance prejudiced his defense. Strickland, 466 U.S. at 686; Yarrington v. Davies, 992 F.2d 1077, 1079 (10th Cir. 1993). In essence, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. "Counsel's performance must be 'completely unreasonable' to be constitutionally ineffective, 'not merely wrong.'" Welch v. Workman, 607 F.3d 674, 703 (10th Cir. 2010)(quoting Hoxsie v. Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997)).

Petitioner raised his claims of second stage ineffective assistance of counsel in state court. The OCCA granted Petitioner's application for an evidentiary hearing. After review of the entire trial, as well as the evidentiary hearing and the trial court's findings of fact and conclusions of law, the OCCA addressed and thoroughly analyzed each of Petitioner's claims and denied relief. Ordinarily this Court would summarize the OCCA's determination rather

than set out lengthy excerpts of the state court's opinion. In this case, however, the OCCA's in-depth identification of each claim and of the testimony and evidence presented at both the trial and evidentiary hearing warrants inclusion here in review of the reasonableness of the state court's determination.

As to Petitioner's claim of ineffectiveness of counsel on second stage closing argument, the OCCA determined:

> Appellant complains that trial counsel was ineffective when the following statements were made in the second stage closing argument by Ms. Sanders: "From the time Ashley was born, this child did not have a chance in this world. The child had no one in her life to protect her. . . . Everybody in this case seemed to be protecting themselves."

> Appellant complains that trial counsel was ineffective in closing argument of the second stage proceedings when Mr. Faulk:

> 1. Referred to mitigation evidence as "excuses" that did not reduce Appellant's responsibility,
> 2. Conceded two aggravating circumstances,
> 3. Told the jury not to consider a life sentence,
> 4. Stated several times that Appellant had lied and in fact was "lying like a fool at the start of this,"
> 5. Said, "He couldn't even take the stand to tell you he did it," and
> 6. Told the jury to give Appellant the most extreme punishment - life without parole.

> The "District Court Findings of Fact and Conclusions of Law" found that the comments of counsel were based on reasonable trial strategy:

>> "Faced with overwhelming evidence of guilt, the primary goal or strategy of both Mr. Faulk and Ms. Sanders was to save the defendant's life. It was determined by trial counsel that a means to that end was to establish a certain rapport with the jury and be candid with the jury, thinking that such a strategy would entice the jury into sparing the defendant's life. . . . Because this

strategy was not successful does not make it unsound or unreasonable."

Ms. Sanders testified that she made her statement to get the jurors' attention. She believed that Ashley "did not have a chance in this world" and that several persons were at fault for not protecting her. Mr. Faulk used candor to try and convince the jurors to spare his client's life. He asked them not to consider "Life" because he was sure they weren't going to anyway. He tried to convince the jury that "Life Without Parole" was the most extreme punishment because the murderer would have the rest of his life to think about what he had done. Counsel told the jury, "[I]f you send him to prison on a Life Without Parole, he'll have to think about it and he'll have to deal with it."

Mr. Faulk's reference to defenses as "excuses" would strike a chord with many jurors who might consider the use of methamphetamines a poor excuse for taking the life of a child. Counsel's statement was accurate when he said that Abshier lied like a fool when Abshier had claimed a car ran over Ashley. However, this was mentioned to emphasize that he subsequently told the truth. In context, counsel said:

> "Dr. Stuemky also said that child abusers have a difficult time admitting what they did, and I think Dr. J.R. Smith also said that. He has gone from lying like a fool at the start of this to at least acknowledging that he did it. He couldn't even take the stand to tell you he did it. He doesn't have the - the nerve, but he told Dr. J.R. Smith that he did it and he didn't give him all the details and that's because he's in denial. But if you send him to prison on a Life Without Parole, he'll have to think about it and he'll have to deal with it."

This was a reasonable strategy in light of the fact that Appellant's first version of the facts was overwhelmingly contradicted by the evidence. Counsel's statement that Appellant had acknowledged that "he did it" is analogous to the facts of Strickland v. Washington, supra. Washington's counsel made a strategic choice "to rely as fully as possible on respondent's acceptance of responsibility for his crimes," where "the trial judge's views on the importance of owning up to one's crimes were well known to counsel." Abshier's Counsel also reasonably concluded that a jury would prefer to hear that Abshier had taken responsibility for his actions. Counsel correctly stated that Appellant didn't take the stand to tell them he did it but used defense experts

to testify that Abshier had confessed to them. In this manner, counsel informed the jury that Abshier was no longer lying, but had admitted the truth.

Abshier, 28 P.3d at 599-600.

Petitioner has not demonstrated the state court's determination to be unreasonable.[8] Based on the record in this case, the state court could reasonably conclude that Petitioner failed to rebut the presumption of adequate assistance. Under certain circumstances, it is not unreasonable to make concessions in an effort to build credibility with the jury and to persuade it to respond positively to the evidence or counsel's argument. "[I]f you make certain concessions showing that you are earnestly in search of the truth, then your comments on matters that are in dispute will be received without the usual apprehension surrounding the remarks of an advocate." Yarborough v. Gentry, 540 U.S. 1, 9-10 (2003)(quoting J. Stein, Closing Argument § 204, p. 10 (1992-1996).

Petitioner additionally claims trial counsel conceded the existence of the two aggravating circumstances and relieved the state of its burden of proving them beyond a reasonable doubt. The OCCA determined the aggravating circumstances had not been stipulated and that counsel's comments were reasonable trial strategy:

> Contrary to Appellant's allegation on appeal, trial counsel did not completely stipulate to the first aggravator, "especially heinous, atrocious, and cruel." Counsel said,
>
> "I don't know. Probably. I'm not going to say anything about that as far as trying to convince you that this isn't probably

---

[8] "Judicial review of a defense attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas." Yarborough v. Gentry, 540 U.S. 1, 6 (2003).

heinous, atrocious, and cruel. The way that child was beaten,
the way her face looked, that's-you know, that's for you to
decide."

This was a reasonable strategy to show the jurors that Abshier was taking
responsibility for what he had done, which was more likely to make a
favorable impression than telling more lies and denying the obvious.

Nor did counsel completely concede the second aggravator, but said:

"Continuing threat. He is a continuing threat if he remains on
meth and is allowed around child[ren] or defenseless people.
But in-prison society, he's a threat to no one."

This argument reiterated Dr. Smith's expert witness testimony that he did not
think that Abshier would be a future threat in prison "because it was a
controlled setting where he would have no access to methamphetamine and
because there were no children in prison." Counsel's argument was that
children and people outside the penitentiary could be protected from violence
by a sentence of Life Without Parole.

The Fourth Circuit said in Brown v. Dixon, 891 F.2d 490, 499-500 (4th
Cir.1989), cert. denied, 495 U.S. 953, 110 S.Ct. 2220, 109 L.Ed.2d 545 (1990),
that during the penalty phase counsel could concede to the jury both Brown's
guilt of the murders [which the jury had already found] and the existence of
two aggravating circumstances without consulting Brown and despite Brown's
continuing protestations of innocence. The statements by Abshier's counsel
in closing argument were not outside the scope of reasonably effective
representation, and unlike closing statements made in Brown, were not
contrary to his client's position at trial. We concur with the trial court's
finding at the evidentiary hearing that these comments of counsel in the second
stage closing argument were based on reasonable trial strategy. There is no
error here.

Abshier, 28 P.3d at 600.

Faced with a horrendous crime that included facts most certainly sufficient to prove

the existence of the aggravating circumstances, counsel's decision to not contest the probable

existence of the aggravating circumstances, but rather, to ask the jury to spare Petitioner's life and sentence him to life without the possibility of parole was a reasonable strategy that does not constitute deficient performance. See Moore v. Gibson, 195 F.3d 1152, 1179-80 (10th Cir. 1999). Further, Petitioner has not demonstrated that even if counsel's actions are considered deficient, they were also prejudicial.

Applying Strickland's requirements and the Supreme Court's admonishments to courts reviewing claims of ineffective assistance of counsel, the OCCA summed up its consideration of counsel's performance in second stage closing argument:

> Trial counsel was an experienced trial lawyer who could determine where best to place his emphasis in closing argument, and we should not second-guess his strategy in hind-sight. He adroitly used his expert, Dr. Smith, to adopt, repeat, and reinforce testimony of Dr. Stuemky, the State's expert witness, that was favorable to Appellant. Trial counsel effectively argued in mitigation during the second stage closing argument his client's probable lack of intent to kill as testified to by Smith and Stuemky. Finally, he asked for mercy for his client: "And all I ask is that if you don't feel Life Without Parole is harsh enough punishment, then I would ask that you extend mercy to him and spare his life."

> In the second stage argument, counsel clearly had one objective which he sought with diligence-to try to avoid the death penalty for his client. Appellant's fourteenth proposition is denied.

Abshier, 28 P.3d at 600.

Petitioner has not demonstrated the OCCA's determination to be either contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence presented.

Petitioner next claims that the evidentiary hearing on remand revealed that "several favorable witnesses in mitigation were readily available had counsel called them." (Pet. at 60-61.) He asserts these witnesses would have fit counsel's stated second stage trial strategy and that there was no valid reason to fail to call them to testify. (Pet. at 67.) On appeal, the OCCA thoroughly reviewed Petitioner's claims and denied relief:

> Appellant's Application for Evidentiary Hearing on Sixth Amendment Claims also claimed that trial counsel's ineffective performance was demonstrated by his failure to investigate and utilize existing mitigating evidence in the second stage of his trial. He attached three affidavits in support of the Application. One was from Abshier's former girlfriend – Brenda McGilberry – the mother of his twin sons. Another was from his former step-father, Billy Clock. The third was from his former sister-in-law, Teresa Abshier. Each claimed they would have testified if they had been asked, yet none of these affiants claim that they contacted Abshier's trial attorney to offer to help during the nearly three (3) years between Appellant's arrest and his trial. No affidavit has been provided from Appellant that he advised his counsel of the existence or names of these potential witnesses.

> Abshier's former girlfriend, Brenda McGilberry, who Abshier had lived with for two or three years before he met Stephanie, claimed in her affidavit that Abshier was good to Ashley and other children. Defense witness, Dr. Wanda Draper, Ph.D. testified at trial that she had tried to find Brenda, as well as Billy Clock, and had not been able to locate them before trial. They were found after trial and stated in their affidavits that they would have testified if they had been asked.

> By the time of the evidentiary hearing held in August 2000, Brenda McGilberry was subpoenaed but did not appear. Appellate counsel conceded in his Supplemental Brief after Evidentiary Hearing that the District Court correctly concluded that "the defendant has failed to establish that Ms. McGilberry would have been available as a witness at the time of trial and thus has failed to show trial counsel was ineffective for failure to present this witness at trial."

Appellant found another witness before the evidentiary hearing, his 17-year-old nephew Paul Abshier, the son of Teresa Abshier. Paul would have been about 14 years old at the time of trial. When he was between five and ten years old, he was around Abshier a lot. His uncle played with him and always had a smile. He saw Ashley asleep on his uncle's lap once. We do not see how failure of trial counsel to discover this witness by the time of trial in January 1998, could prove ineffective assistance of trial counsel. Paul's existence was always known to Appellant, although appellate counsel only discovered him two months before the evidentiary hearing held in August 2000.

Since three (3) experts and Abshier's mother testified at trial about his family history and childhood, and prior drug use, the information reflected in the affidavits and at the evidentiary hearing would be merely cumulative and would not have affected the outcome of the trial. None of the relatives testifying at the evidentiary hearing claimed to have personal knowledge of events occurring on the date of Ashley's death.

The affiants' assertions that Abshier was good to Ashley and other children would carry little weight compared to the number and severity of her injuries, and his admissions that he was alone with her during the day when these injuries occurred and that he had knocked her to the ground and into the floorboard of his car.

Although Appellant claimed to Dr. Smith that he killed Ashley while using methamphetamines, numerous witnesses saw him before and after Ashley's death on the day she died and testified that he exhibited no symptoms of methamphetamine use. In fact, he slept so soundly between 4:30 and 9:00 a.m. that Stephanie could not awaken him, he was asking for food at lunch time, and he was calm at the hospital, not hyper. These symptoms are contra-indications of recent ingestion of methamphetamine which normally causes sleeplessness, loss of appetite, and hyperactivity or fidgety nerves. Stephanie, who was familiar with his behavior when he was using methamphetamine, testified he had not used any for about a month. Thus Appellant's proffered testimony in his application for evidentiary hearing that he used drugs on other occasions would not have been persuasive as to his drug use on the day of the murder.

While a duty is placed on defense counsel to investigate the existence of possible defense witnesses in capital cases, this does not mean that the

defendant has no responsibility to cooperate with and assist his counsel in identifying potential witnesses. The Supreme Court said in <u>Strickland v. Washington</u>, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695-96:

> "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigative decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions."

We note that counsel called one relative to testify at trial in Appellant's behalf. Then on appeal more relatives, or former relatives, signed affidavits that they were not contacted but had highly relevant evidence to present in mitigation. The existence of these witnesses was known to Appellant at the time of trial.

Appellate counsel suggests trial counsel should have spent more time repeating his own witnesses' theories about Abshier's unfortunate childhood. However, the evidence was weak as to any unfortunate childhood. Appellant had a good step-father who took him fishing. He had a normal life style until he got into drugs and alcohol in high school. We find no error here.

<u>Abshier</u>, 28 P.3d at 600-602.

<u>Strickland</u> "places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." <u>Wong v. Belmontes</u>, __ U.S. __, 130

S.Ct. 383, 391 (2009)(quoting <u>Strickland</u>, 466 U.S. at 694). Petitioner has failed to meet his burden. Petitioner has not demonstrated to a reasonable probability how this additional testimony, much of it cumulative to that presented at trial, would, when balancing the aggravating circumstances with the mitigating factors, result in a different sentence. Considered as a whole, the proffered testimony and the additional witness's testimony, along with the facts of the brutal killing of Petitioner's daughter, make it difficult to imagine all the facts in mitigation outweighing the facts supporting the aggravating circumstances. Petitioner has failed to demonstrate how he was prejudiced by the omission of this additional testimony and has failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Habeas relief on this ground is denied.

<u>Ground 5</u>:    <u>Child Abuse Murder and the Heinous, Atrocious, or Cruel Aggravating Circumstance</u>.

Petitioner claims Oklahoma's definition of the aggravating circumstance of especially heinous, atrocious, or cruel and of child abuse murder both require an element of physical abuse and do not, therefore, genuinely narrow the class of persons eligible for the death penalty. When this claim was raised on direct appeal, the OCCA first recognized the Supreme Court's admonition that to pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." <u>Abshier</u>, 28 P.3d at 607 (quoting <u>Zant v. Stevens</u>, 462 U.S.

862, 877 (1983)).  The state court then determined the aggravating circumstance was constitutional and denied relief.[9]

Petitioner asserts the OCCA's determination was contrary to, or an unreasonable application of, Supreme Court precedent because it did not address the overlap between the definition of child abuse murder and the especially heinous, atrocious, or cruel aggravating circumstance.  Accepting, arguendo, Petitioner's assessment of the OCCA's decision, it is important to remember that it is the OCCA's actual determination that must not be contrary to, or an unreasonable application of, clearly established federal law.  The state court is not required to cite to, or even be aware of, controlling Supreme Court precedent "so long as neither [its] reasoning nor the result of [its] decision contradicts" such precedent. Early v. Packer, 537 U.S. 3, 8 (2002).

At the first stage of trial, the following jury instruction was presented regarding the elements of child abuse murder:

INSTRUCTION NUMBER 21

No person my [sic] be convicted of murder in the first degree unless the State has proved beyond a reasonable doubt each element of the crime.  These elements are:

| | |
|---|---|
| First, | the death of a child under the age of eighteen; |
| Second, | the death resulted from the wilful or malicious injuring, torturing, maiming, or using of unreasonable force; |
| Third, | by the defendant. |

---

[9] The OCCA determined the death penalty scheme was narrowed in both the guilt and innocence stage and the penalty stage of trial.  It further found that the class of persons eligible to receive a punishment of death was further narrowed by the requirement that only a unanimous 12 member jury could set the punishment at death. Abshier, 28 P.3d at 607-08.

CR 4-65A

(O.R. at 978.)  During the second stage of trial, the jury was given the following instruction

on the especially heinous, atrocious and cruel aggravating circumstance:

### INSTRUCTION NUMBER 29

As used in these instructions, the term "heinous" means extremely
wicked or shockingly evil; "atrocious" means outrageously wicked and vile;
"cruel" means pitiless, or designed to inflict a high degree of pain, utter
indifference to, or enjoyment of, the suffering of others.
The phrase "especially heinous, atrocious, or cruel" is directed to those
crimes where the death of the victim was preceded by torture of the victim or
serious physical abuse.

CR 4-73

(O.R. at 987.)

Petitioner argues that because torturing or physical abuse are required for both the

crime and the aggravating circumstance, the same evidence was improperly used and

considered by the jury for both.  He contends that because of this commonality of elements,

the especially heinous, atrocious, or cruel aggravating circumstance improperly applies to

every person convicted of the crime of child abuse murder, as the aggravating circumstance

cannot narrow the class of those upon which the death penalty is appropriate.  See Tuilaepa

v. California, 512 U.S. 967, 972 (1994)(an aggravating circumstance "may not apply to every

defendant convicted of murder; it must apply only to a subclass of [such] defendants.")

Although torture and physical abuse are part of both child abuse murder and the

aggravating circumstance, the elements of the crime may be met without an automatic

finding that the murder was especially heinous, atrocious or cruel. The aggravating

circumstance requires conscious physical suffering, but child abuse murder does not:

> The child abuse murder statute applies to any defendant who willfully "used unreasonable force upon a minor child" or "committed any act which caused injury to a minor child," whenever such force or act "resulted in the death of that child." Fairchild, 998 P.2d at 622. The heinous, atrocious, or cruel aggravator narrows this broad class of offenders by requiring (1) that the victim consciously suffer serious abuse or torture and (2) that the offender's conduct reflect wickedness, pitilessness, or deliberate infliction of, indifference to, or enjoyment of suffering. Alverson, 983 P.2d at 516.

Revilla v. Gibson, 283 F.3d 1203, 1218 (10th Cir. 2002); see also Workman v. Mullin, 342

F.3d 1100, 1116 (10th Cir. 2003)(especially heinous, atrocious, or cruel aggravating

circumstance is constitutional, and details of child abuse murder "seem to sit at the heart of

what the Oklahoma statute contemplates in which the death of a victim is preceded by torture

or serious physical abuse). Petitioner has failed to demonstrate the OCCA's determination

to be contrary to, or an unreasonable application of, clearly established federal law.

Ground 6:     Impact of Expert Testimony on Petitioner's Sentencing.

In his sixth ground for relief, Petitioner claims the state's expert's testimony rendered

his sentencing fundamentally unfair. He asserts that because the medical examiner was

unable, during the first stage of trial, to determine the order in which the injuries occurred

or whether the child was conscious when she received the fatal injuries, the opinion

testimony of Dr. Stuemky – a pediatrician and emergency room physician – that the child

was conscious during the beating was not based on an expert analysis and was without foundation or basis.[10]

On appeal, the OCCA found Dr. Stuemky to be qualified and his testimony admissible:

> Appellant complains in Proposition Three that Dr. Stuemky should not have been allowed to testify about his expert opinion that the child was conscious and crying during the beating she received from Abshier. Dr. Stuemky testified that one would expect a child to be conscious during most of the injuries because abuse usually starts because of the infant's crying and whining, and once the child becomes unconscious and stops crying and whining, the abuse stops too. The doctor's testimony was based on over twenty-two (22) years of experience with abused children, interviews with "many, many perpetrators," and from studies in the literature and studies in his own experience. His testimony was corroborated by Appellant's story to Dr. Smith that Ashley sensed his rage and began whining and he hit her very hard. It was also corroborated by Stephanie's testimony that Appellant hit Ashley and cussed at her when Ashley was crying in the car at Wal-Mart in October 1994.

> Dr. Stuemky was no less qualified to testify about this than he was qualified to testify about his opinion based on his experience that only one or two persons out of 200 who had killed children had actually intended to do so. This testimony was favorable to the Appellant, and appellate counsel does not contend this testimony or line of questioning was error.

> Generally, expert testimony is admissible where the witness's specialized knowledge will assist the jury in understanding the evidence or determining a fact in issue; provided that the witness is qualified as an expert by knowledge, skill, experience, training, or education. 12 O.S.1981, § 2702.

---

[10] Dr. Stuemky was the Chief of Service of General Pediatrics for Children's Hospital and Medical Director of Emergency Services. He testified he was board certified in Emergency Pediatrics and chaired the child protection team for Children's Hospital, a multi-disciplinary team composed of medical staff, social services, mental health personnel, representatives of the District Attorney's office, law enforcement and child welfare personnel. (Tr., Vol. XIII, pp. 56-60.)

The decision of whether an expert witness is allowed to testify rests within the discretion of the trial court and its decision will not be upset by this Court in the absence of abuse of its discretion. Barnhart v. State, 1977 OK CR 18, 559 P.2d 451; Roubideaux v. State, 1985 OK CR 105, 707 P.2d 35, 39.

This Court has acknowledged the existence of the Child Abuse Syndrome and has allowed expert testimony to assist the jury in understanding child abuse evidence. Raymond v. State, 1986 OK CR 51, ¶ 4, 717 P.2d 1147, 1149; Rice v. State, 1983 OK CR 97, ¶ 7, 666 P.2d 233, 234. An expert opinion is not objectionable merely "because it embraces an ultimate issue to be decided by the trier of fact." 12 O.S.1981, § 2704. But see Hooks v. State, 1993 OK CR 41, ¶¶ 11-16, 862 P.2d 1273, and Gabus v. Harvey, 1984 OK 4, 678 P.2d 253.

Dr. Stuemky's testimony was properly admitted, and Appellant's third proposition is denied.

Abshier, 28 P.3d at 604.

Whether or not the child consciously suffered was an important element necessary to the State to prove the existence of the especially heinous, atrocious, or cruel aggravating circumstance. When asked, considering the injuries, whether he would expect the child to have been conscious during the beating, Dr. Stuemky responded that he would, and then explained the reasons for his opinion:

A.    The – I think two reasons. One is so many of the injuries had surrounding areas of – of bruising and it takes a beating hard in a live child, a live patient, to demonstrate those findings, meaning that it wasn't killed immediately. Plus, in my experience with abused children, over twenty-two years, I – I've been able to interview and talk with many, many perpetrators and both from studies we know in the literature and our own experience, I know it's usually – What – what evokes a perpetrator to lose control and – and strike a child many times is – is whining and continuous crying and  – and – and in our child deaths that we see from abuse, repeatedly – And perpetrators have discussed this with us. It's the child's crying that continues to evoke the beatings. And when there's cessation of crying, usually the beatings stopped.

And this child was – was beaten numerous times and that would indicate to me that at least for a period of time, the child was still whining and still crying and then at some point the child became unconscious, the beating most likely stopped.

(Tr., Vol. XIII, p. 63.)

Petitioner claims the testimony is objectionable and unreliable because it goes beyond Dr. Stuemky's academic expertise, that no foundation was laid to support the type of information relied upon by Dr. Stuemky, and that his "one dimensional" generic description was inapplicable to Petitioner and the specific incident involved here.  In Bullock v. Carver, 297 F.3d 1036 (10th Cir. 2002), the petitioner claimed his conviction was unreliable and a violation of his due process rights because it was dependent on the testimony of children who had been subjected to coercive interview tactics by a medical professional.  The Tenth Circuit first noted, citing to Estelle v. McGuire, 502 U.S. 62, 67 (1991), that habeas relief is available only for alleged violations of federal rights, and not for errors of state law. Bullock, 297 F.3d at 1055.  The court stated that under its precedent, habeas relief is only available for an improper state evidentiary ruling "if the alleged error was 'so grossly prejudicial [that it] fatally infected the trial and denied fundamental fairness that is the essence of due process.'" Id. (quoting Revilla v. Gibson, 283 F.3d 1203, 1212 (10th Cir. 2002)).  The Tenth Circuit declined to hold that Bullock's trial was fundamentally unfair, as his trial counsel had cross-examined the medical professional on his credibility, raised the argument that he had planted the story with the children and countered his interview techniques. Id.

In the instant case, any possible error regarding whether Dr. Stuemky was qualified to testify as an expert or whether the basis for his opinion was reliable is a matter of state evidentiary law and is not cognizable in habeas corpus proceedings. Lewis v. Jeffers, 497 U.S. 764, 780 (1990). Petitioner has not demonstrated that Dr. Stuemky's testimony and opinion were so grossly prejudicial that his sentencing phase of trial was fatally infected such that he was denied the fundamental fairness that is the essence of due process. Dr. Stuemky's testimony was based on years of experience with abused children, interviews with perpetrators, documented studies, and his own studies. Trial counsel cross-examined Dr. Stuemky, clarifying his testimony on direct and illiciting favorable testimony that only one or two persons out of 200 who had killed a child had actually intended to do so. Counsel relied heavily on that testimony in his closing argument, calling Dr. Stuemky "our best witness." (Tr., Vol. XIV, p. 142.)

The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." Dowling v. United States, 493 U.S. 342, 352 (1990). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." Id.; see also Estelle v. McGuire, 502 U.S. 62, 72 (1991). Petitioner has not demonstrated Dr. Stuemky's testimony was fundamentally unfair, or that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law.

Ground 7:      Sufficiency of Evidence to Support Aggravating Circumstances.

Petitioner next claims that the evidence presented by the State was insufficient to support either the continuing threat aggravating circumstance or the especially heinous, atrocious, or cruel aggravating circumstance. Respondent responds that Petitioner has not demonstrated the OCCA's determination was contrary to, or an unreasonable application of, clearly established Supreme Court law.

On appeal, the OCCA found the aggravating circumstances to be sufficiently supported by the evidence:

> Appellant's Proposition Nine challenges the sufficiency of the evidence at trial to support the two aggravating circumstances found by the jury in this case: (1) that the murder was "especially heinous, atrocious, or cruel," and that (2) "there exists a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

> In Powell v. State, 906 P.2d 765, 1995 OK CR 37, ¶¶ 67, 71, Order Granting Rehearing, ¶ 3, 906 P.2d 765, 781, 782, 784, cert. denied, 517 U.S. 1144, 116 S.Ct. 1438, 134 L.Ed.2d 560 (1996), we adopted by unanimous opinion the "standard of review" for sufficiency of the evidence to support aggravating circumstances in a death-penalty case established by the United States Supreme Court in Lewis v. Jeffers, 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). The Supreme Court held in Jeffers that the standard for federal habeas corpus review of a state court's finding of aggravating circumstances was the same as for the essential elements of the crime, that is, the "rational factfinder" standard established in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

> The standard of review for sufficiency of evidence to support an aggravating circumstance is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. Powell, 906 P.2d 765, 1995 OK CR 37, Order Granting Rehearing, ¶ 3, 906 P.2d at 784. We had previously adopted the Jackson v. Virginia standard for appellate review of sufficiency of the evidence to establish essential elements of the crime. Spuehler v. State, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-204.

We reaffirmed the Powell decision in two subsequent cases citing both Powell and Jeffers: DeLozier v. State, 1998 OK CR 76, ¶ 36, 991 P.2d 22, 29-30, and Jackson v. State, 1998 OK CR 39, ¶ 80, 964 P.2d 875, 894 ( Per Curiam, with two judges concurring, and one judge concurring in result).

In order to sustain its burden of proof to establish that a murder was "especially heinous, atrocious, or cruel" the State must prove that the victim consciously suffered before death. Smith v. State, 1996 OK CR 50, ¶ 42, 932 P.2d 521, 535, cert. denied, 521 U.S. 1124, 117 S.Ct. 2522, 138 L.Ed.2d 1023 (1997). Dr. Stuemky testified that in his expert opinion, Ashley was conscious and crying during the beating she received from Abshier. He testified that one would expect a child to be conscious during most of the injuries because abuse usually starts because of the infant's crying and whining and once the child becomes unconscious and stops crying and whining, the abuse stops too. His testimony was corroborated by Appellant's story to Dr. Smith that Ashley sensed his rage and began whining and he hit her very hard. It is also corroborated by Stephanie's testimony about Abshier hitting Ashley and cussing at Ashley when she was crying in the car at Wal-Mart in October 1994.

Dr. Choi, the pathologist testified that there were many separate injuries before death but she could not tell whether Ashley was conscious when each of the blows was inflicted. Ashley vomited and then sucked it back into her lungs. She had received a blunt force injury to her chest that was severe enough to bruise her thymus which is protected behind the chest bone. The end of her tongue was bruised. She had nine (9) separate extensive subgaleal (beneath the scalp) hemorrhages, as well as the extensive subdural (inside the skull) hemorrhaging over both the right and left surface of the brain, and swelling of the brain which caused her death, as well as hemorrhaging inside the eye membrane which is consistent with violent shaking, or shaken-baby syndrome. In addition, the outer layer of her skin was ripped away from a large area of her face. Logic tells us that all of these wounds could not have been simultaneous.

Abshier claims, "The only evidence that the victim in this case was conscious [when she received the numerous blows to her head and body] came through the opinion testimony of Dr. Stuemky." Abshier, however, overlooks statements he himself made to Dr. Draper and to Dr. Smith. He told Dr. Draper that "he hit the child and knocked the child down and knocked the child to the ground," and that he "lost control." He told Dr. Smith that

"because Ashley sensed his rage and began whining, he grabbed her by the hair and neck and slammed her down on the floorboard" of the car. It is therefore obvious that she was conscious when at least two of those severe blows were inflicted upon her by Abshier, one in the car, and one outside. The evidence supports the jury finding beyond a reasonable doubt that Ashley was conscious and suffering in great pain during at least a significant part of the assault she received upon her body, before she lost consciousness and died.

The evidence likewise supports the jury finding beyond a reasonable doubt that "there exists a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The evidence in this case was that Appellant had abused his daughter many times before, including breaking her arm several months before he killed her. He avoided getting medical treatment for her arm. In 1994, Stephanie had seen Appellant hit Ashley in the car at Wal-Mart, Sherrie Casey had seen him once sling Ashley over the car seat by her arm, and on another occasion kick her to the ground in the yard. Ms. Casey also discovered many bruises on Ashley which had been hidden beneath her clothing. Curt Been of the Department of Human Services observed a knot on Ashley's forehead.

Appellant had assaulted Ashley many times on the day of her death. He did not take her to the hospital until she had been dead for several hours. He peeled the skin off of her face. As we said in Workman v. State, 1991 OK CR 125, ¶ 25, 824 P.2d 378, 383-384, cert. denied, 506 U.S. 890, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992), this Court has consistently held that the calloused manner in which a crime is committed may support a finding of a continuing threat. Fisher v. State, 1987 OK CR 85 736 P.2d 1003, 1009; Robison v. State, 1984 OK CR 21, ¶ 37, 677 P.2d 1080, 1088, cert. denied, 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984). Appellant's continuing pattern of brutality and violence against a helpless child supports the jury finding, beyond a reasonable doubt, that "there exists a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

Appellant's Proposition Nine is without merit.

Abshier, 28 P.3d at 609-11.

As noted by the OCCA, the proper standard for reviewing sufficiency of the evidence claims regarding aggravating circumstances was established in Lewis v. Jeffers, 497 U.S. 764

(1990). In <u>Lewis</u>, the Supreme Court adopted the standard for review of sufficiency of the evidence claims set out in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979), namely whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Id.</u> at 319.[11] The <u>Lewis</u> Court held that although aggravating circumstances are not elements of an offense, the standard of federal review for determining whether the state court violated the Fourteenth Amendment is equally applicable to safeguard the Eighth Amendment's guarantee against arbitrary and capricious imposition of the death penalty. <u>Lewis</u>, 497 U.S. at 782.

Here, because the OCCA applied the <u>Lewis</u>/<u>Jackson</u> standard when reviewing Petitioner's claims of insufficient evidence to support the aggravating circumstances, this Court's review is limited to whether the OCCA's decision was contrary to, or an unreasonable application of, the <u>Lewis</u>/<u>Jackson</u> standard, or whether it was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1)-(2).

Petitioner has failed to demonstrate the OCCA's decision was unreasonable in either respect. As to the continuing threat aggravating circumstance, he simply argues that his only history of violence was against his daughter and his wife in situations where he was under

---

[11] "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." <u>Lewis</u>, 497 U.S. at 782 (quoting <u>Jackson</u>, 443 U.S. at 319).

the influence of alcohol and drugs. The OCCA considered the multiple instances of abuse over an extended period of time, as well as the "callous nature" in which the murder was committed, and determined the essential elements of the aggravating circumstance had been met.

As to the especially heinous, atrocious, or cruel aggravating circumstance, Petitioner reiterates his claim that Dr. Stuemky's testimony was insufficient proof of conscious pain or suffering. The OCCA considered not only the testimony of the medical examiner and Dr. Stuemky, but also Petitioner's own statements to Dr. Draper and Dr. Smith describing striking the child and losing control when she sensed his rage and began whining, and found support for the elements of the especially heinous, atrocious, or cruel aggravating circumstance. The OCCA's decisions were based on reasonable determinations of the facts and application of <u>Lewis</u>/<u>Jackson</u>. Habeas relief is denied on this ground.

## IV.     PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING.

Petitioner requests an evidentiary hearing regarding his claims pertaining to trial counsel's concessions during voir dire and his conduct at the sentencing proceedings. The Court has considered Petitioner's specific requests and, based on the reasons set forth in this opinion, has determined an evidentiary hearing to be neither warranted nor required.

The first step in deciding whether an evidentiary hearing is warranted is to determine whether Petitioner failed "to develop the factual basis" of his claims in state court. <u>Williams v. Taylor</u>, 529 U.S. 420 (2000); <u>Miller v. Champion</u>, 161 F.3d 1249, 1253 (10th Cir. 1998);

28 U.S.C.A. § 2254(e)(2). According to Miller, if "a habeas petitioner has diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so, § 2254(e)(2) does not apply." Miller, 161 F.3d at 1253. In other words, if a petitioner diligently sought an evidentiary hearing in state court and his request was denied, the petitioner can not be deemed to have "failed to develop the factual basis" of the claims. Miller, 161 F.3d at 1253.

Petitioner was granted an evidentiary hearing by the OCCA on this issue which is part of the record and this Court's consideration of Petitioner's claims. Accordingly, Petitioner did not fail to develop the claims and his request for an evidentiary hearing must be governed by pre-AEDPA standards. Id. at 1249, 1253 (10th Cir. 1998). Under the pre-AEDPA standards, Petitioner "is entitled to receive an evidentiary hearing so long as his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." Id. (citing Medina v. Barnes, 71 F.3d 363, 366 (10th Cir. 1995)).

In his request, Petitioner does not identify what additional facts from the state evidentiary hearing he alleges might be developed that would entitle him to habeas relief. Without such an indication, the Court cannot determine whether Petitioner's allegations are controverted by the existing factual record – a record that includes the state evidentiary hearing on this issue. Absent specific allegations, Petitioner's request amounts to mere speculation. Speculation alone is insufficient to warrant or require an evidentiary hearing. Accordingly, Petitioner's request for an evidentiary hearing is denied.

## V.    CONCLUSION.

After a complete review of the transcripts, trial record, appellate record, record on post-conviction proceedings, briefs filed by Petitioner and Respondent, and the applicable law, the Court finds Petitioner's request for relief in his *Petition For a Writ of Habeas Corpus* (Dkt. No. 18) to be without merit.  ACCORDINGLY, habeas relief on all grounds is **DENIED**.  A Judgment will enter accordingly.

IT IS SO ORDERED this 18th day of August, 2010.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE